[No. D054267. Fourth Dist., Div. One. Jan. 21, 2010.]

LINDA PONIKTERA, Plaintiff and Appellant, v.
DEBORAH SEILER, as Registrar of Voters, etc., Defendant and
Respondent.

COUNSEL

Law Office of Ken I. Karan and Ken I. Karan for Plaintiff and Appellant.

John J. Sansone, County Counsel, Miriam E. Brewster and Timothy M. Barry, Deputy County Counsel, for Defendant and Respondent.

OPINION

**McDONALD, J.**—In this action, Linda Poniktera alleged Deborah Seiler, acting in her official capacity as Registrar of Voters for the County of San Diego (Registrar), violated statutory and constitutional provisions by (1) having a written policy that improperly limited the ability of citizens to document election voting with cameras and other recording devices, and (2) not enacting or enforcing policies to secure election ballot boxes against tampering or to require poll workers to account for ballots. Poniktera's action sought declaratory and injunctive relief, as well as a writ of mandate, to require Registrar (1) to allow citizens to use cameras or other recording devices inside polling stations in future elections, and (2) to comply with obligations to secure ballot boxes against tampering in future elections.

After a hearing at which the trial court made numerous evidentiary rulings adverse to Poniktera, the trial court denied the requested relief. On appeal, Poniktera asserts the trial court abused its discretion in its evidentiary rulings and by denying her request for a writ of mandate and for declaratory and injunctive relief.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Parties*

Registrar is the chief elections official for the County of San Diego and was responsible for the statewide elections held in San Diego County on

February 5 and June 3, 2008. Poniktera is a registered voter in San Diego County and, during the 2008 elections, acted as a poll watcher to gather information about the governmental conduct of elections. As part of her efforts, she used photography at polling places.

### B. The Challenged Governmental Conduct

### The Photography Policy

Poniktera's attorney of record, Mr. Karan, attended a poll worker training session held prior to the 2008 elections and obtained a copy of the elections manual provided to poll workers to assist them in completing their election day assignments (Manual). Mr. Karan objected to one of the sections of the Manual relating to photography at the polling place and expressed those concerns to Registrar. The Manual stated: "Photography and videotaping are not allowed by the public or voters during voting hours. However, if someone would like to photograph the seals on voting equipment prior to the opening of the polls or after the polls close they may be permitted to do so."

Mr. Floyd, a senior deputy with the San Diego County Counsel's Office who advises Registrar on legal matters and helps resolve issues with members of the public on election days, communicated with Karan (by both telephone and e-mail) prior to the 2008 elections concerning this policy. Floyd explained Registrar included that statement in the Manual because Registrar wished to ensure that both voters and poll workers have a positive experience on election day, and various constitutional and statutory provisions (including the provision of Elec. Code,[1] § 18541 that prohibits the taking of photographs of voters within 100 feet of a polling place with the intent to intimidate) were designed to ensure voters would feel secure in the secrecy of their ballots and be free from overt or tacit intimidation. Floyd explained the "intent to intimidate" element could place volunteer poll workers in the untenable position of having to perform complex constitutional analyses or of trying to discern a photographer's intent (while also trying to protect the secrecy and integrity of the vote and keeping the polls running securely and efficiently), and the statement in the Manual was not intended to preclude photography that did not interfere with poll workers or voters. Floyd gave his cellular telephone number to Karan and told him that, if he was attempting to take pictures as he described and a poll worker took exception, Karan could call Floyd directly and Floyd would speak with the poll worker to ensure Karan could take pictures without disrupting the election process or violating restrictions found in the Elections Code. Floyd offered to meet with Karan at the first polling place Karan intended to observe so that a protocol

---

[1] All further statutory references are to the Elections Code unless otherwise specified.

for these telephone calls could be established or, alternatively, Floyd offered to call ahead and prepare the poll workers so they would know Karan was going to take pictures and the circumstances under which photography would be allowed.

Poniktera alleged poll watchers are threatened with arrest for violating Registrar's written policy against using cameras and for trespassing at polling places. However, Poniktera did not aver she had been threatened with arrest, or even that she was denied the use of her camera.[2] Instead, the evidentiary basis for this claim is apparently based on Karan's experiences during the February 2008 election. Poniktera claimed Karan was threatened with arrest because he violated the written policy banning the use of cameras. However, Registrar's evidence was that on the morning of the February 2008 election, Karan called Floyd and complained that a precinct inspector was not allowing him to take photographs in the polling place and that the police had been called. Floyd immediately went to the polling place and found Karan talking on his cellular telephone on one part of the driveway in front of the residence while two police officers were standing on another part of the driveway and the poll workers were at their stations assisting voters. Floyd spoke with Karan and the officers, and then with the precinct inspector (Ms. Ritter), and learned Karan had attempted to debate his constitutional rights with Ritter (rather than calling Floyd to resolve any impasse), which was disrupting voters trying to enter to vote while Karan was lecturing Ritter on the law. Floyd told the poll workers and the officers that Mr. Karan would be allowed to photograph the documents he requested as long as it did not interfere with the voters. Thereafter, during a lull in the voting, Karan took pictures of the ballot box and log. Floyd again offered to meet Karan at any poll and/or call the poll workers to let them know he would be allowed to take photographs as he had at this precinct, but Karan declined the offer and left the polling place. No one threatened to arrest Karan, who obtained the pictures he sought.

Later that day, Karan visited a second polling station. He claimed that when he attempted to document the closing of the polling place, police were called and claimed he was trespassing, and that he avoided arrest by leaving the premises. However, Registrar's evidence showed Karan spent the afternoon and evening hours at this second polling station and, during his time there, interfered with the poll workers' ability to carry out their tasks by talking loudly on his cellular telephone, by questioning the workers while

---

[2] To the contrary, Floyd averred he received a call from Poniktera, who stated she was at a precinct in El Cajon and was attempting to take pictures of the ballot box but the precinct inspector would not let her. Floyd then spoke with the precinct inspector and, after assuring himself that Poniktera's request would not be disruptive or interfere with voters casting ballots or the poll workers' activities, told the precinct inspector it would be permissible for Poniktera to take pictures.

they were trying to carry out their duties, by sitting at a table reserved for provisional voters, and by standing inches away from poll workers while they were performing their duties. The poll workers called police because Karan was disrupting their efforts to finish their work prior to the 9:30 p.m. deadline. Police arrived and escorted Karan outside the polling station where they waited with him until the poll workers had finished closing the station. Karan then caravanned behind the poll workers when they went to the ballot dropoff location to deliver their materials.

## *The Ballot Security and Accounting Policies*

Poniktera also challenged Registrar's policies and procedures for protecting the integrity of the ballot count. Poniktera submitted declarations stating some of the ballot boxes were delivered to Registrar's central counting facility without seals or identifying markings, submitted photographs of the allegedly mismarked boxes, and claimed Registrar refused to investigate. Poniktera also alleged Registrar's written policies relieved poll workers of the obligation to account for all of the ballots delivered to the polling station.

Registrar's evidence explained the steps taken during the 2008 election to ensure the accuracy of the balloting process. As a result of restrictions imposed on electronic voting devices by California's Secretary of State, Registrar implemented a new paper-based ballot system first used in the February 2008 election and employed again in the June 2008 election. Under that system, paper ballots were distributed to more than 1,650 precincts to be used and then returned to the Registrar's office on election night for scanning at a central location. The quantity and sequence numbers of the ballots were listed on a chain of custody document and precinct inspectors were instructed to count all ballots they received and verify the quantity and sequence numbers in advance of election day. They were also instructed to contact the Registrar's office to confirm the information and advise staff if there were any discrepancies. After the polls closed, precinct inspectors were instructed to record the number of ballots issued on the ballot statement portion of the roster of voters, and to record the number of unused ballots, voted ballots, voted provisional ballots, and spoiled ballots (if any) on the roster of voters. The number of unused, voted (including provisionals), and spoiled ballots should equal the number of ballots issued. However, because this reconciliation is performed at the end of an extremely long day, it is not uncommon for the numbers to vary slightly.[3]

---

[3] Registrar explained that precinct inspectors were also instructed to count all signatures in the rosters. The process is complicated by the fact that the roster is segregated into white pages for active voters, pink pages for inactive voters, blue pages for voters added to the roster in the last week before the election, and peach-colored pages for provisional voters. Despite intensive training, it is not uncommon for poll workers to forget to ask the voter to sign the roster or to

After the reconciliation is complete to the best of their ability, the precinct inspectors are instructed to put the voted ballots in one carton and seal it. Unvoted ballots are to be placed in different cartons and also sealed. Two persons then accompany the ballots to a collection center where the ballots, along with other key items and supplies, are received by a sheriff reserve officer. Ballots returned to a collection center prior to about 9:30 p.m. are then collected by a Registrar troubleshooter, who returns them to the ballot tally center in the Registrar's office where the precinct number and other information is logged.

During the February 2008 election, when this ballot return method was used for the first time, all ballots were returned in brown cartons and one of the cartons was designated by a red label "Voted Ballots Inside" for delivering voted ballots. Because the method was new, poll workers were unfamiliar with the requirements and some made mistakes, including not properly sealing boxes or putting unvoted ballots in cartons designated for voted ballots. In all cases, however, ballots were delivered by two poll workers to collection centers and designated personnel returned the cartons safely to the Registrar's office.

Building on the experience obtained from the February 2008 election, Registrar emphasized the voted ballot return requirements in a variety of ways for the June 2008 election. For example, a white carton was designed for the return of voted ballots, and Registrar created a full color supply poster to provide a pictorial representation of all supplies to be returned in the various containers including the white boxes. Additionally, an outline was placed on the white carton to reinforce where the seal was to be placed, and a signature box was added to encourage compliance with the requirement for poll workers to sign the carton containing voted ballots. Also, receipt logs used at collection centers were redesigned and lighted clipboards were used to ensure collection center personnel could track the receipt of voted ballot cartons and other critical items. The increased emphasis on the return of supplies was reinforced in the Manual, during classroom training, and in the online training supplement many poll workers used in June. Additionally, a system for scanning a bar code on the white cartons as they arrived was perfected to help document and track the receipt of voted ballots.

As a result of these efforts and improvements, the return of the voted ballots in the appropriate white cartons was faster and more accurate, and the

---

ask voters to sign the roster when they are simply dropping off a voted mail ballot. Sometimes voters on the inactive (pink) pages are given a provisional ballot by mistake. All of these errors can lead to an imbalance in the number of signatures versus ballots issued.

number of cartons returned without seals dropped dramatically although some workers used a white "standard" seal rather than the blue seal designated for that purpose.[4]

## II

## STANDARD OF REVIEW

Poniktera asserts our standard of review is de novo. We disagree with Poniktera's apparent belief that a de novo standard of review applies to all issues in this case.

Our review of questions of law is de novo. (*County of Yolo v. Los Rios Community College Dist.* (1992) 5 Cal.App.4th 1242, 1248 [7 Cal.Rptr.2d 647].) However, to the extent Poniktera's appeal implicitly challenges any factual findings of the trial court, we do not disturb the trial court's findings if substantial evidence supports the judgment. Instead, we resolve all conflicts in favor of the judgment, even when (as here) the trial court's decision is based on evidence received by declaration rather than by oral testimony. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 [243 Cal.Rptr. 902, 749 P.2d 339].)

Poniktera, asserting that all of the relevant claims are subject to de novo review, relies on *Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075 [47 Cal.Rptr.2d 661] for the proposition that a court independently reviews the record in matters involving First Amendment claims. However, *Berry* involved a demurrer to a claim that an ordinance violated First Amendment protections, and the *Berry* court observed, in that context, the court is required to assume the truth of all material facts, and then apply de novo review to whether the ordinance violated First Amendment protections. (*Berry*, at p. 1082.) Here, however, there are historical facts in dispute, and we believe the court's discussion in *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791 [35 Cal.Rptr.2d 418, 883 P.2d 960] of the standard of review in a civil case involving constitutional claims is more apt. In *Ghirardo*, the issue was whether a transaction violated the constitutional prohibition against usury. The Supreme Court said the "trial court's determination of the historical basis of the transactions—in common parlance, what happened—raises a question of fact" (*id.* at p. 801), but "[o]nce the historical facts of the transaction are

---

[4] Registrar acknowledged the ballots in the boxes depicted in Poniktera's photographs may have been improperly marked or sealed, but averred that the tally reconciliation sheet of the voted ballots (completed by the Registrar's staff as part of the official canvass) was reconciled against the ballot statement/certificate of roster for each of the precincts and all but one were found to balance.

determined, the question of whether *that type of transaction* is subject to the usury proscription is a question of law" (*id.* at p. 800).

## III

## THE PHOTOGRAPHY POLICY

Poniktera challenges Registrar's policy, contained in the Manual given by Registrar to poll workers, which stated "Photography and videotaping are not allowed by the public or voters during voting hours. However, if someone would like to photograph the seals on voting equipment prior to the opening of the polls or after the polls close they may be permitted to do so."[5] Poniktera asserts this policy restricts her First Amendment rights and is therefore invalid unless it satisfies strict scrutiny under *Burson v. Freeman* (1992) 504 U.S. 191 [119 L.Ed.2d 5, 112 S.Ct. 1846] (plur. opn. of Blackmun, J.) (*Burson*). Poniktera argues the policy does not survive strict scrutiny because the policy is not narrowly tailored to serve a significant government interest.

### A. *Analytic Framework: The Standard of Scrutiny*

■ When a governmental policy limits activity ostensibly protected under the First Amendment,[6] the courts have developed a forum-based analysis to

[5] Poniktera does not challenge the similar policy, contained in the Poll Worker Training Guidelines published by California's Secretary of State, that provides "voters may not be photographed, videotaped or filmed entering or exiting a polling place, and may not be filmed inside the polling place, without the voter's permission." Although this guideline is contained within the subheading "Media and public opinion pollsters have different rules than poll watchers do," it does not suggest poll watchers have greater rights to film voters inside the polling place than do members of the media. Instead, the state guidelines provide that "[o]nly poll workers and voters engaged in voting may be within the voting booth area during the time the polls are open. [Elec. Code, § 14221.] Others may be in the polling place observing the process as long as they do not interfere with the voter's right to a secret ballot or the poll worker's ability to perform [his or her] duties."

[6] Although our evaluation of Poniktera's challenge to Registrar's photography policy presumes the policy limits Poniktera's First Amendment activity, courts have questioned whether poll watching is protected by the First Amendment. As one federal court recently observed, "plaintiff has cited no authority, and this Court's independent search has discerned none, for the proposition that an individual poll watcher possesses any actionable rights above and beyond those afforded any member of the general public that is present at a polling place. Although plaintiff certainly has a right ' " 'to associate for the advancement of political beliefs,' " ' [citation], poll watching is not incidental to this right and has no distinct First Amendment protection. *See Turner v. Cooper*, 583 F.Supp. 1160, 1161–1162 (N.D.Ill. 1983) (holding that the act of poll watching is not protected by the First Amendment); *cf. Tiryak v. Jordan*, 472 F.Supp. 822, 824 (E.D.Pa. 1979) (suggesting that poll watchers are not constitutionally guaranteed components of the election process). It is at least arguable that the State of New York could eliminate the position of poll watcher without offending the First Amendment

evaluate whether the validity of the governmental policy is to be reviewed under the strict scrutiny standard or the more deferential rational basis standard. As explained by the United States Supreme Court, the determination that the regulated conduct qualifies as protected speech "merely begins our inquiry. Even protected speech is not equally permissible *in all places and at all times*. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. [Citation.] Recognizing that the Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,' [citation], the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." (*Cornelius v. NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 799–800 [87 L.Ed.2d 567, 105 S.Ct. 3439].)

██ In *Clark v. Burleigh* (1992) 4 Cal.4th 474 [14 Cal.Rptr.2d 455, 841 P.2d 975] (*Clark*), the court explained that, under the forum-based analysis, property owned or controlled by the government falls into one of three categories. The first category, denominated as the "traditional public forum," is limited to those places "that by long tradition has been used by the public at large for the free exchange of ideas. 'Public streets and parks fall into this category.' [Citation.] Indeed, public streets and parks may be the only places that the high court has yet recognized as 'traditional public forums.' " (*Id.* at p. 482.) When a law regulates the content of speech in this type of forum, the law is "subject to strict scrutiny: 'Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.' [Quoting *Cornelius, supra,* 473 U.S. at p. 800.]" (*Id.* at p. 483.)

██ The second category of public property is the " 'designated public forum,' " that involves " 'property that the state has opened for expressive activity by part or all of the public.' [Quoting *International Soc. for Krishna Consciousness, Inc. v. Lee* (1992) 505 U.S. 672, 678 [120 L.Ed.2d 541, 112 S.Ct. 2701].] As will appear, there are few examples of designated public forums in Supreme Court jurisprudence because the court has rarely—and not

---

because it is a mere creature of state statute. [Citations.] Nevertheless, we will assume, for the purpose of discussion, that plaintiff's right to serve as a poll watcher is protected by the First Amendment." (*Cotz v. Mastroeni* (S.D.N.Y. 2007) 476 F.Supp.2d 332, 364, fn. omitted.)

at all in the past decade—placed any property in this category." (*Clark, supra,* 4 Cal.4th at p. 483, fn. omitted.) For this second category of fora, a "content-based regulation of speech . . . is [also] subject to strict scrutiny: 'Regulation of such property is subject to the same limitations as that governing a traditional public forum.' [Citation.]" (*Id.* at p. 483.)

■ The residual category of public property encompasses " 'all remaining public property' [quoting *International Soc. for Krishna Consciousness, Inc. v. Lee, supra,* 505 U.S. at pp. 678–679], a category usually referred to as the 'nonpublic forum.' " (*Clark, supra,* 4 Cal.4th at p. 483, fn. omitted.) *Clark* explained that regulations limiting expressive activity in nonpublic fora[7] need " 'survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.' " (*Clark, supra,* 4 Cal.4th at p. 483.)

B. *Application*

*A Polling Station Is a Nonpublic Forum*

We conclude the confines of the polling station, the only area to which the challenged policy can and does apply, is a nonpublic forum.

Although there is no controlling California authority, numerous federal courts have concluded (albeit in different contexts) that the premises of a polling place constitute a nonpublic forum. In *Marlin v. District of Columbia Bd. of Elections and Ethics* (D.C. Cir. 2001) 236 F.3d 716, for example, the court evaluated the constitutionality of a prohibition on campaign stickers in polling places and found, at the outset, that a polling place is a nonpublic forum. The court reasoned that "[t]he forum here, the interior of a polling place, is neither a traditional public forum nor a government-designated one. It is not available for general public discourse of any sort. The only expressive activity involved is each voter's communication of his own elective choice and this has long been carried out privately—by secret ballot in a restricted space." (*Id.* at p. 719.) Having concluded the interior of the polling station was a nonpublic forum, the court declined to apply strict

---

[7] Although *Clark* employed the nomenclature of "nonpublic forum," it cautioned that "[a]lthough it may be convenient shorthand, the phrase 'nonpublic forum' is somewhat misleading. Property in this category is not 'nonpublic' in the sense that it is privately owned; it remains at all times public property either owned or controlled by the government. Nor is the property a 'forum' in the sense of a meeting place or medium for open discussion; on the contrary, it is precisely because it is not such a meeting place or medium that the government can lawfully close it to such discussion. In short, a 'nonpublic forum' is simply public property that is not a public forum by tradition or design." (*Clark, supra,* 4 Cal.4th at p. 483, fn. 9.)

scrutiny when evaluating the restriction. Instead, the court limited its review to whether the policy was a reasonable, content-neutral regulation and concluded the policy was a "reasonable means of ensuring an orderly and peaceful voting environment, free from the threat of contention or intimidation." (*Id.* at pp. 719–720.) Other courts, considering analogous restrictions on expressive activity around polling stations, have likewise consistently concluded polling stations are neither traditional nor designated public forums. (See *United Food & Commercial Workers Local 1099 v. City of Sidney* (6th Cir. 2004) 364 F.3d 738, 749–750 [Parking lots and walkways on schools and private property that led to polling places were nonpublic forums because, by "opening up portions of school and private property for use as polling places on election day, Ohio has not opened up a nontraditional forum for public discourse. In fact, there is no evidence in the record of discourse of any sort. There is no evidence of expressive activity occurring anywhere on the properties involved, other than 'each voter's communication of his own elective choice[,] and this has long been carried out privately—by secret ballot in a restricted space.' "]; *Cotz v. Mastroeni, supra*, 476 F.Supp.2d at p. 364 ["[p]olling places clearly are non-public fora and voters present are subject to various First Amendment restrictions, including those based on content"]; *American Federation of State, County and Mun. Employees, Council 25 v. Land* (E.D.Mich. 2008) 583 F.Supp.2d 840, 848–849; cf. *Ramos v. Carbajal* (D.N.M. 2007) 508 F.Supp.2d 905, 919 [dicta]; *Cotham v. Garza* (S.D.Tex. 1995) 905 F.Supp. 389, 396, fn. 4 ["[a]lthough voting booths are places where voters communicate their choices of candidates and propositions, they are not public forums"].)

Poniktera argues we should disregard this weight of authority because those courts misapplied or disregarded the holding and rationale of *Burson, supra*, 504 U.S. 191 (plur. opn. of Blackmun, J.). Poniktera asserts *Burson*, when correctly read, compels the conclusion that the interior of a polling station *is* a public forum, and therefore any restrictions on First Amendment activity must be assessed under strict scrutiny. In *Burson*, the statute under challenge prohibited solicitation of votes and display of campaign materials in the building in which the polling place was located or within 100 feet of the entrance to that polling place. (*Burson*, at pp. 193–194.) The *Burson* plurality first concluded the statute restricted speech "in quintessential public forums. These forums include those places 'which by long tradition or by government fiat have been devoted to assembly and debate,' such as parks, streets, and sidewalks. [Citation.] 'Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.' [Citation.]" (*Id.* at pp. 196–197, fn. omitted.) *Burson* then examined whether the content-based restriction survived strict scrutiny and concluded the state had two compelling interests (to protect voters from confusion and undue influence, and to preserve the integrity of its election process), and that enacting a campaign-free zone in the 100-foot perimeter outside of the polling place was sufficiently narrowly tailored to survive strict scrutiny. (*Id.* at pp. 198–206.)

Poniktera asserts that *Burson*, by characterizing the statute as creating "a restricted zone around the voting compartments" (*Burson, supra*, 504 U.S. at p. 206 (plur. opn. of Blackmun, J.)) and concluding strict scrutiny applied because that zone was a quintessential public forum, necessarily concluded the *interior* of the polling station *apart* from the voting booth itself was a public forum, and therefore limitations on conduct within the polling station were subject to the same strict scrutiny standard as limitations on conduct on the abutting streets. From this reading of *Burson*, Poniktera asserts all of the subsequent federal cases that concluded the premises of a polling place constitute a nonpublic forum simply misunderstood the core of *Burson*. However, Poniktera's argument ignores that the *Burson* court focused *not* on the ban against campaigning *inside* the polling station, but instead focused on the 100-foot perimeter *outside* the polling station. It was because this perimeter enveloped "those places 'which by long tradition or by government fiat have been devoted to assembly and debate,' *such as parks, streets, and sidewalks*" (*id.* at p. 196, italics added) that *Burson* found the statute implicated expressive rights in a public forum.

The comments of both Justice Scalia's concurring opinion in *Burson*, as well as the dissent, confirm our reading that *Burson* understood it was *not* approving the application of strict scrutiny to restrictions on conduct *within* the confines of the polling station, but was instead concerned with the validity of restrictions on conduct occurring outside of the polling station's premises. Justice Scalia, although agreeing with the result, noted that even though the 100-foot zone can encompass streets and sidewalks adjacent to the polling places, the application of strict scrutiny was erroneous because the premise of the plurality's opinion—that such areas were " 'quintessential public forums,' having ' "*by long tradition* . . . been devoted to assembly and debate" ' "— was incorrect. (*Burson, supra*, 504 U.S. at p. 214.) Instead, Justice Scalia noted, "[i]nsofar as areas adjacent to functioning polling places are concerned," statutes restricting campaigning during polling hours have a long history of general use, and the 100-foot perimeter was included in most of the statutes banning election day speech near the polling place. (*Ibid.*) Scalia concluded, "the streets and sidewalks around polling places have traditionally *not* been devoted to assembly and debate" (*id.* at p. 216), and therefore strict scrutiny should not be applied to the challenged statute. (*Id.* at pp. 214–216.) Under Justice Scalia's concurrence, therefore, the nonpublic forum boundaries would extend beyond merely the polling station itself to encompass the environs around that station. The dissent equally recognized that the sole issue was whether a law "silencing the political speech *outside* the polling place" (*id.* at p. 220 (dis. opn. of Stevens, J.)) could pass constitutional muster because "there is no disagreement that the restrictions on campaigning *within the polling place* are constitutional; the issue is not whether the State

may limit access to the 'area *around the voter*' but whether the State may limit speech in the area *around the polling place*." (*Id.* at p. 220, fn. 4.)

█ Our reading of *Burson* convinces us to join in the conclusions reached by several federal courts that the area within the polling station is a nonpublic forum. The legislative scheme in this state demonstrates that polling stations have not been opened for public discourse, but are instead subject to regulations that restrict the station to the purposes of balloting. For example, "[o]nly voters engaged in receiving, preparing, or depositing their ballots . . . may be permitted to be within the voting booth area before the closing of the polls" (§ 14221), only one person may occupy a voting booth at a time, and voters may not remain in a voting booth for longer than is necessary to mark the ballot (§§ 14224, 14281). Furthermore, "[o]nly members of the precinct board . . . shall be permitted, during the hours within which voting is in progress, to sit at the desk or table used by the precinct board." (§ 14223, subd. (a).) Additional conduct by voters inside the polling station is regulated: no one may interfere or attempt to interfere with the secrecy of voting (§ 18564, subd. (b)); voters may not place any mark upon a ballot that would make the ballot identifiable (§ 14287); and voters may not show their ballot to any person in such a way as to reveal its contents. (§§ 14275, 14291.) In short, polling places have not been opened for public discourse, and indeed are subject to significant restraints on expressive conduct within the polling station, and we therefore conclude polling stations must be deemed "nonpublic forums."

### The Photography Policy Is Reasonable

█ Because the photography policy applies to limit conduct in a nonpublic forum, the policy must be upheld if it is reasonable and is not an effort to suppress activity because of disagreement with the speaker's view.[8] (*Clark, supra,* 4 Cal.4th at p. 483.) Restrictions designed to " 'reserve the forum for its intended purposes,' " and that limit the public to " 'activities compatible with the intended purpose of the property' " will be upheld when the restrictions are " 'reasonable in light of the purpose which the forum at issue serves.' " (*Id.* at p. 491.)

---

[8] Our evaluation in this section assumes the photography policy limits activity by Poniktera that is in fact protected under the First Amendment rather than other sources. Certainly, Poniktera has a statutory right to "observe the election process" under section 2300, subdivision (a)(9)(A). However, at least one court has mused that restrictions on poll watchers should not be tested under First Amendment standards because a state "could eliminate the position of poll watcher without offending the First Amendment because it is a mere creature of state statute." (*Cotz v. Mastroeni, supra,* 476 F.Supp.2d at p. 364.) However, as did the *Cotz* court, we will test the policies under First Amendment standards on the assumption that poll watchers have some First Amendment interest in observing and reporting on events at polling stations.

The parties agree that the intended purpose of the polling station is to conduct balloting, and Poniktera does not dispute that a ban on conduct interfering with the ability of voters to cast their secret ballots or disrupting the balloting process would be a reasonable and valid regulation under *Clark*. However, Poniktera contends photography at polling stations does not *in fact* either intimidate voters or disrupt the balloting process, and therefore the ban is an unnecessary and unreasonable restriction on a poll watcher's ability to document the events he or she is statutorily entitled to observe.[9] However, the *Burson* court, rejecting an analogous claim that the 100-foot perimeter was invalid because it was an unnecessarily overbroad restriction, explained: "[B]ecause a government has such a compelling interest in securing the right to vote freely and effectively, this Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question. [Citation.] Elections vary from year to year, and place to place. It is therefore difficult to make specific findings about the effects of a voting regulation. Moreover, the remedy for a tainted election is an imperfect one. Rerunning an election would have a negative impact on voter turnout. Thus, requiring proof that a 100-foot boundary is perfectly tailored to deal with voter intimidation and election fraud 'would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not *significantly impinge* on constitutionally protected rights.' [Quoting *Munro v. Socialist Workers Party* (1986) 479 U.S. 189, 195–196 [93 L.Ed.2d 499, 107 S.Ct. 533] (italics added by *Burson*).]" (*Burson, supra,* 504 U.S. at pp. 208–209 (plur. opn. of Blackmun, J.), fns. omitted.)

The same rationale applies with even greater force to restrictions not subject to strict scrutiny. The state could reasonably conclude voters may be deterred from voting if they know (either in advance or upon arriving at the polling station) their presence will be photographically recorded, even by photographers claiming to have the most benign of intents, because the voter cannot be expected to read the mind of the photographer and the voter is not required to accept at face value the photographer's protestations of benevolence. Additionally, to the extent a voter objects (whether reasonably or unreasonably) to having his or her picture taken, the state could rationally

---

[9] Poniktera also suggests that, because the Legislature has enacted a statute that prohibits taking photographs or videos of a voter entering or exiting a polling place "with the intent of dissuading another person from voting" (§ 18541, subd. (a)(3)), the Legislature has by negative implication determined photography is permissible when the photographer lacks the requisite mens rea. However, this statute does not necessarily mean photography is permitted, but only that the Legislature has elected to limit criminal penalties to those photographers who possess the requisite evil intent.

conclude the smooth operation of a polling station would be disrupted were poll workers required to referee disputes between poll watchers and voters. Although we agree with Poniktera that poll watchers have the right to observe the conduct of elections, the regulation in question represents a reasonable accommodation of the interest of voters to cast a secret ballot (as well as to a right of privacy) without significantly impinging on any constitutionally protected rights of the poll watchers.[10]

Poniktera also asserted below, and argues on appeal, that she was entitled to declaratory relief that Registrar may not restrict the right of poll watchers to observe the conduct of elections by threatening to arrest a poll watcher for trespass merely because the poll watcher is present at a poll. However, there was no evidence suggesting Registrar had a policy of threatening to arrest poll watchers merely for being present at polling stations. Moreover, the evidence would permit the conclusion that neither Poniktera nor anyone else was threatened with liability for trespass based merely on the poll watcher's presence at a polling station. Although Karan averred that police threatened to arrest him at two polling stations during the February 5 election,[11] Registrar's evidence showed (1) police were called to the two polling stations at which Karan was present because he was disrupting the process of balloting and of closing the polling station, and (2) Karan was not threatened with arrest for merely being present at those polling stations. Registrar's evidence, which the trial court was entitled to credit, supports the conclusion there was not an actual and present controversy over whether police may arrest a person who is merely present at a polling place as a poll watcher, which supports the trial court's ruling denying Poniktera's requested declaratory relief. (Cf. *In re Claudia E.* (2008) 163 Cal.App.4th 627, 638 [77 Cal.Rptr.3d 722] [declaratory relief requires a real dispute between parties and is unavailable where it would amount to an advisory opinion on a particular or hypothetical state of facts].)

---

[10] Poniktera complains her right to *observe* is significantly restricted if she cannot *photographically record* the events she is entitled to observe. However, in other contexts, the courts have recognized the right to observe and report on events does not necessarily carry with it the right to photograph or record those events. (See, e.g., *U.S. v. Yonkers Bd. of Education* (2d Cir. 1984) 747 F.2d 111, 112–114.)

[11] Karan claimed that, when he tried to photograph the seals on ballot boxes being used for voted ballots, the police were called and they threatened to arrest him for trespassing on the grounds of a polling place. He also claimed that, when he attempted to document the closing of another polling place, the police were again called and they warned Karan that he was trespassing. Karan claimed he avoided arrest on both occasions by leaving the premises.

## IV

## THE BALLOT SECURITY AND ACCOUNTING CLAIM

Poniktera's complaint sought declaratory relief that Registrar had the obligation under sections 15201 and 15202 to seal the containers used to transport the ballots and to deliver the sealed container to the designated central counting place.[12] Poniktera also sought declaratory relief that Registrar had the obligation under sections 14107 and 14405, subdivision (a), to ensure that poll workers, after closing the polls, account for all the ballots received, issued, and spoiled, and Registrar's contrary policy (which allegedly relieved poll workers of that duty) was unlawful. The trial court declined to issue the requested relief, and Poniktera argues this was an abuse of discretion.

### A. Standard of Review

A trial court's decision to grant or deny declaratory relief is reviewable for abuse of discretion. (*Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 433 [121 Cal.Rptr.2d 844, 49 P.3d 194].) Courts have considerable discretion to deny declaratory relief when resolution of the controversy "would have little practical effect in terms of altering parties' behavior." (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 648 [88 Cal.Rptr.3d 859, 200 P.3d 295].)

### B. The Ballot Sealing Claim

Poniktera asserts the trial court erred by denying declaratory relief because there is a dispute over whether sections 15201 and 15202 impose on Registrar the "responsib[ility] for ensuring ballot security or investigating evidence of tampering." Those sections provide that, after the polls close, the "precinct board" at each polling location must "[s]eal the container used to transport voted ballots" (§ 15201, subd. (a)(1)), and that at least two members

---

[12] Poniktera also sought a writ of mandate directing Registrar to comply with the sealing and transportation obligations. However, to obtain issuance of a writ of mandamus, a petitioner must demonstrate, among other things, that the respondent has failed to act on a clear ministerial duty to perform an act specifically required by law. (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 842 [102 Cal.Rptr.2d 468].) On appeal, Poniktera does not claim Registrar failed to require sealing or secure transportation, but instead alleges the requirements imposed by Registrar could (in some undisclosed way) be better. Poniktera cites no authority suggesting that a writ of mandate may be issued under such circumstances, and we do not further consider this claim. (See *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078 [123 Cal.Rptr.2d 278].)

of the precinct board must "deliver the ballots, in a sealed container" to the central counting place or the designated receiving station (§ 15202). The trial court declined to issue the requested relief because it concluded there was nothing for the court to declare regarding the parties' rights or obligations that was not set out in the Election Code statutes.

Poniktera does not assert Registrar has any direct obligations under sections 15201 or 15202. Instead, Poniktera asserts those statutes require that when Registrar chooses to seal ballot boxes using adhesive seals, Registrar must (1) provide adhesive seals that are "tamper evident, . . . difficult to reproduce, and . . . controlled," and (2) ensure poll workers place the seals on the boxes in a location on the box that precludes the box from being opened without detection. Even assuming those statutes impose a ministerial duty on the mechanics of sealing ballot boxes, there was substantial evidence from which the trial court could conclude Registrar *does* provide adhesive seals that are tamper evident, difficult to reproduce, and controlled, and that Registrar *does* provide training to poll workers describing the type of seal and manner of affixing those seals on boxes that (if followed) would preclude the box from being opened without detection.[13] Accordingly, the trial court acted within its discretion to deny declaratory relief because the requested declaration "would have little practical effect in terms of altering parties' behavior." (*Meyer v. Sprint Spectrum L.P., supra,* 45 Cal.4th at p. 648.)

C. *The Ballot Accounting Claim*

Poniktera also sought declaratory relief that Registrar had the obligation to ensure poll workers account for all the ballots but Registrar relieved poll workers of that duty and the policy was unlawful.

 Section 14405 provides the members of the precinct board "shall account for the ballots delivered to them by returning a sufficient number of unused ballots to make up, when added to the number of official ballots cast and the number of spoiled and canceled ballots returned, the number of ballots given to them," and "shall complete the roster as required in Section 14107." The roster required by section 14107 includes a statement certifying that "the total number of official ballots received, voted, rejected, spoiled and

---

[13] Poniktera's evidence below was *not* that sealing requirements were absent, but that some poll workers on occasion either did not use the *designated* seal or placed the seal on the box in a place other than that designated, or that the "standard" seals mistakenly used by some poll workers could be reproduced. However, Poniktera cites no authority suggesting that under the statutory scheme Registrar, *having created and distributed tamper proof seals and having developed extensive training manuals to inform poll workers of how to employ such seals,* also imposes on Registrar the mandatory obligation to insure that poll workers commit no errors when following those instructions.

canceled, found in the ballot container and the number accounted for is as indicated on the ballot statement."

Registrar's policy meets the requirements imposed by law. There was substantial evidence supporting the conclusion that Registrar instructed precinct inspectors that they were required to record the number of ballots issued to the precinct on the ballot statement portion of the roster of voters. They were also instructed to record the number of unused ballots, voted ballots, voted provisional ballots, and spoiled ballots (if any) on the ballot statement, and the number of unused ballots, voted ballots (including provisionals) and spoiled ballots should equal the number of ballots issued to the precinct. Poniktera did not contend below that these instructions, standing alone and when complied with, did not satisfy the obligations imposed on Registrar by sections 14405 and 14107.

Instead, Poniktera asserted below that at least 17 precincts had signed ballot statements and the poll workers had *not* been able to reconcile the number of ballots issued by elections officials with the number of ballots issued, spoiled and returned.[14] However, Registrar's evidence explained that poll workers were required to conduct the accounting but, because the calculation is performed at the end of an extremely long day, as a practical matter it is not uncommon for the numbers to vary slightly. Accordingly, for those precincts unable to obtain an exact match, the ballot statement required the poll workers to so indicate and to provide their explanation on the ballot statement for the discrepancy. Thereafter, as part of the official canvass, Registrar conducts an independent review of the ballot statements to reconcile the ballot statements with the actual ballot count. This subsequent reconciliation by Registrar showed that, of the 17 precincts identified by Poniktera as filing ballot statements showing an inability to account for all of the ballots, 16 of those precincts did in fact balance.

We are convinced Registrar's policies do require poll workers to (1) conduct an accounting to the best of their ability, (2) file the roster required by section 14107, and (3) certify on that roster the total number of official ballots

---

[14] Poniktera also appears to complain that Registrar's official policy relieved poll workers of their duty to account for all ballots because of a statement contained on page 69 of the Manual. The Manual, which described the tasks to be performed between 8:30 and 9:30 p.m., instructed poll workers that once they finish the closing procedures, the precinct inspector and touch-screen inspector were required to transport all equipment, ballots and election supplies to the collection center immediately, but "[i]f it is 9:30 p.m., you have closed your touchscreen, packed your supplies and you are still working on the ballot statement, pack up everything and come on in to your collection center." The quoted language does not, on its face or by implication, relieve poll workers of their duty to account for all ballots, but only instructs them to relocate to the collection center by 9:30 p.m.

received, voted, rejected, spoiled and canceled as indicated on the ballot statement. Registrar's policies do not violate any requirements imposed by law.

## V

## EVIDENTIARY CLAIMS

Poniktera finally asserts the court abused its discretion by making evidentiary rulings excluding some of Poniktera's evidence, and these errors were prejudicial.

### A. *Standard of Review*

" 'Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' " (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639 [92 Cal.Rptr.2d 115].) The court's " 'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.' " (*Id.* at p. 640.) However, even where a trial court improperly excludes evidence, the error does not require reversal of the judgment unless such error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) Poniktera has the burden to demonstrate it is reasonably probable a more favorable result would have been reached absent the error. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431–1432 [77 Cal.Rptr.2d 574].)

### B. *Evaluation*

Poniktera argues that a variety of evidentiary objections were improperly sustained, and the rulings were prejudicial.

First, Poniktera claims the trial court prejudicially erred when it sustained Registrar's lack of foundation and hearsay objections to Poniktera's statement that she had "knowledge that the Registrar of Voters carries out policies that could subject me and other citizens to arrest for attempting to observe, document and report on the conduct of elections." That evidence is hearsay to the extent it was offered to prove Registrar has and carries out those policies, and Poniktera does not contend otherwise. Instead, Poniktera argues the statement was not hearsay because it was offered to prove Poniktera's state of mind leading to the filing of the lawsuit. However, Poniktera does not cite any relevant authority articulating why the state of mind that led her to file the lawsuit would be relevant to any disputed issue. The objection was properly sustained.

Poniktera next asserts the trial court prejudicially erred by sustaining Registrar's lack of foundation objection to 12 pages of photographs of certain ballot boxes used to return ballots in the June 2008 election. Even assuming the court erred by not allowing Poniktera to file the exhibits as part of her reply papers, we are convinced the error was harmless. The photographs do not depict *unsealed* ballot boxes, but instead appear to depict boxes sealed with a white (rather than a blue) seal. The trial court was aware, by virtue of Registrar's concession, that some poll workers used a white "standard" seal (rather than the blue seal designated for that purpose) to seal the ballot boxes for transport to the collection center. Because the excluded photographs only depicted facts conceded by Registrar, any alleged error was harmless. (See, e.g., *Weller v. Chavarria* (1965) 233 Cal.App.2d 234, 247 [43 Cal.Rptr. 364] ["the exclusion of evidence which has only a cumulative effect will not justify reversal on appeal . . ."].)

Poniktera finally contends the trial court prejudicially erred by sustaining objections to Karan's second and third declarations. However, Karan's second declaration merely reiterated the same claim raised in his initial declaration (e.g., that "[a]t no time did I interfere with the conduct of an election or create a continuing disruption" and that he was "threatened with arrest"), and that he disputed the contrary version of events recited by Registrar's witnesses. Karan's third declaration, filed well after the deadline for reply papers and filed and served only two days prior to the hearing on Poniktera's application, purported to attach a transcript of the exchange between Karan and the poll workers at the second polling station. However, Registrar's objections to Karan's third declaration included that (1) Poniktera offered no reason why the contents of Karan's third declaration could not have been included as part of Poniktera's reply papers, and (2) Poniktera did not produce the full audiotape of all conversations that took place while Karan was present at the second polling place but instead appears to have produced an edited version containing only snippets of those conversations.

Our review of Karan's second declaration convinces us that it merely expanded on his previous claim that he was not disruptive and was threatened with arrest, and was cumulative. Additionally, the trial court had discretion to conclude Karan's third declaration was improper based both on its untimeliness and because the transcript it attached was so heavily redacted that it was unreliable. Under those circumstances, we agree with the observations of the court in *Guimei v. General Electric Co.* (2009) 172 Cal.App.4th 689, 703–704 [91 Cal.Rptr.3d 178], that "consideration of . . . the . . . [supplemental] declaration [was] within the discretion of the trial court. [Citation.] Plaintiffs fail to demonstrate that the trial court abused its discretion in refusing to consider the [supplemental] declaration, much less that they were prejudiced by that refusal. They thus have failed to meet their burden of showing reversible error. [Citations.]"

## DISPOSITION

The judgment is affirmed. Registrar is entitled to costs on appeal.

Nares, Acting P. J., and Aaron, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 28, 2010, S180671.