Filed 5/26/15  Robles v. McErlain CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JULIE R. ROBLES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PATRICK J. McERLAIN,<br><br>Defendant and Appellant. | A139333, A139532<br><br>(San Mateo County<br>Super. Ct. No. CIV 497415) |

Defendant and appellant Patrick J. McErlain appeals from a trial court order renewing a civil harassment restraining order that limits him from engaging in various acts vis-à-vis his neighbor, plaintiff and respondent Julie R. Robles.  McErlain contends reversal is required because the trial court applied an incorrect burden of proof and committed prejudicial evidentiary errors.  He also challenges the trial court's order granting attorney fees to Robles.  We affirm the judgment and reverse, in part, the order granting attorney fees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

McErlain and Robles are both residents of a condominium development in Burlingame, known as Park Plaza Towers.  McErlain lives in one unit (# 305) and rents out another (# 104).  Robles lives near McErlain's rental unit.

1

## A. The Original Civil Harassment Restraining Order

The original civil harassment restraining order, which was issued pursuant to Code of Civil Procedure[1] section 527.6, was in effect for a two year period starting in May 2011. Neither the original petition nor any evidence from the original proceeding has been included in the record. The order reflects that the matter was decided upon written stipulation of the parties. Pursuant to the parties' stipulation, McErlain was ordered not to "[h]arass, attack, . . . threaten, . . . follow, stalk, . . . keep under surveillance, or block [the] movements" of Robles. He was further ordered not to "directly or indirectly" contact Robles or "telephone, send messages, mail, or e-mail" to her. McErlain was also ordered to stay at least 10 feet away from Robles, her home, and her vehicle. Additionally, McErlain was ordered not to take "pictures" of Robles during the time the restraining order was in effect. McErlain was also prohibited from taking "pictures of the postal worker who delivers the mail" to Park Plaza Towers. McErlain was allowed to attend homeowners' association meetings and was required to stay at least three feet away from Robles at such meetings. Robles was prohibited from "taking pictures" of McErlain and from contacting him during the time the restraining order was in effect.

## B. The Petition to Review the Civil Harassment Restraining Order

The following facts were shown by the declarations and briefs in support of, and in opposition to, Robles's renewal petition.

Shortly after moving into Park Plaza Towers, McErlain was hired as the temporary resident manager and was invited to apply for the permanent position. In the course of filling the position, the homeowners' association learned that McErlain had a felony record. When McErlain failed to provide the requisite documentation and information, another individual was hired for the position. Both the new resident manager and a successor quit due to the harassment by McErlain. Tracy Fallon was then hired as the resident manager. Robles, together with Fallon and several other residents had ongoing problems with McErlain.

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

2

Robles's initial petition for a civil harassment restraining order was coordinated with seven other civil harassment cases against McErlain. A settlement was eventually reached and at least 10 civil harassment restraining orders were issued against McErlain. Robles and two other residents, sought to renew their respective restraining orders. Of the remaining restraining orders, two residents have orders that do not expire until September 2015; five other residents have not undertaken to renew their respective orders.

In her petition to renew the civil harassment restraining order, Robles avers that McErlain "continues to harass, vex, annoy, and scare" her, as well as other residents of Park Plaza Towers. At the time of Robles's declaration, there were 13 residents and one caregiver at Park Plaza Towers with restraining orders against McErlain. Since February 2011, the San Mateo County District Attorney's Office has opened five separate cases against McErlain regarding multiple violations of several restraining orders; the matters have now been consolidated into one case. Additionally, in July 2012, the homeowners' association filed a civil suit against McErlain and his landlord/mother, Nancy McErlain.

Robles claimed that McErlain and his mother have recently benefitted from a substantial inheritance, which they have used to abuse the court system to further harass Robles. McErlain subpoenaed Robles under her own restraining order and then filed an action against her in July 2012 for housing discrimination. Robles states the following: "Now, in addition to making me worry everyday whether he will jump out behind a car in the garage in an attempt to scare me to death, or vandali[ze] my car, or storage locker, his harassment has now grown to include financial and legal harassment."

McErlain claimed that Robles was the one harassing him and discriminating against him for his recent bipolar disorder diagnosis. According to McErlain and his physicians, his behavior has changed since being medicated. Robles, however, maintained that McErlain's behavior had "not really changed" and, in fact, in the two years following the issuance of the restraining order, McErlain's behavior actually became worse. The following incidents were alleged to have occurred since the original restraining order was issued in May 2011:

3

On July 10, 2011, McErlain "accosted" Robles in the underground parking garage at Park Plaza Towers. McErlain "flipped her off and made no effort to leave the vicinity." Robles called the police and waited outside for them to arrive. As Robles talked to the responding officer, McErlain drove out of the garage and "flipped off" both the officer and Robles.

On November 25, 2011, McErlain was observed taking pictures of Robles with a video camera.

On February 25, 2012, McErlain used a neighbor to contact Robles. The neighbor knocked on Robles's door and when Robles opened the door she saw McErlain in the hallway about five feet from her front door. Robles saw McErlain gesture toward the neighbor and heard McErlain tell the neighbor, " ' Here, give this to Julie.' " It was a photograph of McErlain. Robles asked the neighbor inside and closed the door, telling the neighbor that McErlain was listening to them. Immediately, McErlain was heard outside the door, saying, " 'I am not[.]' " After the neighbor left Robles's unit, McErlain remained in the hallway, just a few feet from Robles's front door, "glaring at her in a hostile and threatening manner." (Fn. omitted.)

On February 28, 2012, McErlain posted a paper containing "derogatory statements" about Robles on the front door of his rental unit, which is "immediately adjacent" to Robles's unit. That same day, Robles called the police to report this violation of her restraining order. Also that day, three other residents called the police to report violations of their respective restraining orders.

On April 16, 2012, McErlain came within 10 feet of Robles in the first floor lobby near her unit. McErlain approached Robles in "an aggressive and agitated fashion," making a fist and "pointing his middle finger in the air at her." McErlain made no effort to leave the area.

On June 13, 2012, Robles was driving in her car, headed away from Park Plaza Towers, when she saw McErlain walking in the opposite direction. McErlain "turned towards her and glared at her, then made a fist, pointing his middle finger in the air in her direction."

At unspecified times since the original retraining order was issued, McErlain could often be found "simply sitting in his car" in the underground parking garage. When Robles or other neighbors entered the garage, McErlain would "begin flashing his headlights and honking his horn for no apparent reason"; at other times, McErlain would "simply sit and glare" at Robles and other residents.

Also, since both before and after the original restraining order was issued, McErlain has been observed videotaping and photographing Robles and the other residents of Park Plaza Towers.

McErlain had also violated the restraining order, by "repeatedly and regularly turn[ing] toward" Robles and facing her "with hands on his upper legs, glaring at her in a hostile and threatening manner." Robles claimed that McErlain would not hesitate "to keep [her] in fear by any means possible . . . ."

Because of these continuing problems, Robles sought to renew the restraining order. Robles averred that without a restraining order, McErlain would "harass and terrorize" her in any way possible, including photographing her, "shining a bright, blinding light" in her face, "growling and screaming horrible profanities" at her, "making rude physical gestures" towards her, and vandalizing her car and storage locker, "all without any provocation."

In opposition, McErlain explained that since the time of the original May 2011 restraining order, he has sought treatment for his bipolar disorder and since April 2012 he has been on a "successful medical regimen which has markedly changed his personality and his ability to get along with others and deal with stress." McErlain disputed the violations raised by Robles, claiming that he "has abided by all the terms of the 2011 order for years." McErlain further claimed that, despite his "changed personality and behavior," some of the residents at Park Plaza Towers "have continued to taunt" him and "discriminate against him," and have "gone so far" as to file a lawsuit against him and his mother in an effort to evict him.

*C.*     *The Hearing and the Court's Order Renewing the Civil Harassment Restraining Order*

At the hearing on the renewal petition, Robles's attorney made an offer of proof that Robles would testify as to the matters set forth in her renewal request, and the matter proceeded to cross-examination by McErlain's attorney. When asked by defense counsel if she was trying to get McErlain evicted, Robles stated, "I think our neighborhood would be safer without him." McErlain did not testify at the hearing. Instead, he presented two character witnesses, his criminal defense attorney and his mother. At the time of the hearing, ten criminal charges were pending against McErlain.

In granting the renewal petition, the court explained as follows: "It is an ongoing pattern of conduct that has to put in context. Certainly, it is good news that Mr. McErlain is getting treatment, but that is not the issue. The issue . . . is whether there is a reasonable belief that this conduct has continued and will continue. That is what the Court has to consider . . .: Reasonable apprehension that the harassment will continue . . . . [¶] . . . [¶] The Court does find there is reasonable apprehension that the harassment will continue based on the evidence."

The court granted a three-year order, which is set to expire in May 2016.

## II. DISCUSSION

*A.*     *Overview of Civil Harassment Restraining Orders*

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' [Citations.]" (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.) "It does so by providing expedited injunctive relief to victims of harassment. [Citation.]" (*Ibid.*) "[S]ection 527.6 enables '[a] person who has suffered harassment'—defined as 'unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose'—to 'seek a temporary restraining order and an injunction prohibiting harassment as provided in this section.' (. . .§ 527.6, former subds. (a), (b).)" (*Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 724.) "The course of conduct must be such as

6

would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).)

A " '[c]redible threat of violence' " is defined as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

A " '[c]ourse of conduct' " that seriously alarms, annoys, or harasses a person and serves no legitimate purpose is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual . . . ." (§ 527.6, subd. (b)(1).)

A trial court generally must hold a hearing on a section 527.6 petition within 21 days of the court's grant or denial of a temporary restraining order. (§ 527.6, subd. (g).) "At the hearing, the judge shall receive any testimony that is relevant"—including hearsay—"and may make an independent inquiry." (§ 527.6, subd. (i); *Duronslet v. Kamps, supra,* 203 Cal.App.4th at pp. 728-729 [hearsay evidence is admissible].) Consistent with principles governing injunctions generally, an injunction under section 527.6 "is authorized only when it appears that wrongful acts are likely to recur." (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402 (*Russell*).) Thus, while a single act of violence or harassment, standing alone, generally does not require the issuance of an injunction, it "may support a conclusion that future harm is highly probable." (*Id*. at p. 404.) Willful disobedience of a harassment injunction is a crime. (§ 527.6, subd. (s); Pen. Code, § 273.6.)

"If the judge finds by clear and convincing evidence that unlawful harassment exists, an injunction shall issue prohibiting the harassment." (§ 527.6, subd. (i).) The court need not make express findings, but rather, "the granting of the injunction itself necessarily implies that the trial court found that [the respondent] knowingly and willfully engaged in a course of conduct that seriously alarmed, annoyed or harassed [the

7

petitioner], and that [the petitioner] actually suffered substantial emotional distress." (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1112 (*Ensworth*).)

**B.      Standard of Review**

"The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record." (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188 (*R.D.*).) "We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 (*Schild*).) "Inferences may be drawn not only from the evidence but from the demeanor of witnesses and their manner of testifying." (*Ensworth, supra,* 224 Cal.App.3d at p. 1110.) "Where the trial court has determined that a party has met the 'clear and convincing' burden, that heavy evidentiary standard then disappears. 'On appeal, the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding appellant's evidence, however strong.' " (*Id*. at p. 1111, fn. 2.)

While we review the sufficiency of the evidence supporting the trial court's factual findings under the substantial evidence standard, the question of "whether [those] facts . . . are legally sufficient to constitute civil harassment under section 527.6 . . . [is a] question[ ]. of law subject to de novo review." (*R.D.*, *supra,* 202 Cal.App.4th at p. 188.)

**C.      Sufficiency of the Evidence**

The parties disagree over what the trial court must find in order to renew a civil harassment restraining order. McErlain contends it must find clear and convincing evidence of recent harassment. Robles responds that the standard of proof for renewal is a reasonable apprehension of continuing misconduct. Robles also suggests that she was not required to show any harassment since the original restraining order was issued.

Preliminarily, we observe that Robles's argument about the requisite standard of proof is premised upon a conflation of the showing required for a restraining order under the Domestic Violence Protection Act (DVPA) with the more stringent requirements of

civil harassment restraining orders authorized by section 527.6. "The DVPA . . . permit[s] issuance of protective orders on a different, broader basis than permitted under . . . section[] 527.6 . . . . [Citation.] Additionally, a lower level of proof is required for issuance of a protective order under the DVPA . . . a preponderance of the evidence, rather than clear and convincing evidence. [Citations.]" (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.) Inasmuch as the DVPA affords broader protection and requires a lesser standard of proof, we find no basis to rely on the cases cited by Robles that analyze this different statutory scheme. (Cf. *Lister v. Bowen* (2013) 215 Cal.App.4th 319, 331-332 [standard is reasonable apprehension in renewing DVPA restraining order]; *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1283 [same].)

We pause to note that below McErlain did not object to the reasonable apprehension standard advocated by Robles. In fact, his attorney argued to the court that "the standard is a reasonable apprehension." In any event, applying the correct standard on appeal, we discern no reversible error by the trial court.

To the extent McErlain argues that section 527.6 requires *recent* harassment, nothing in the statutory language supports this assertion. The required finding that harassment "exists" simply means that there is a reasonable likelihood of *future* harassment if the injunction is not renewed. As a matter of traditional equitable principles, "[i]njunctive relief will be denied where, at the time of the order or judgment, no reasonable probability exists of the recurrence of the past acts. An injunction should not be granted as punishment for past acts where it is unlikely that they will recur. [Citation.]" (*Donald v. Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 184.)

*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324 (*Scripps*), interpreting the parallel provisions set forth in section 527.8 supports our conclusion. "Section 527.8 was . . . intended to enable employers to seek the same remedy for [their] employees as section 527.6 provides for natural persons." (*Scripps, supra,* 72 Cal.App.4th at pp. 333-334.) Section 527.8 allows an employer "whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace," to seek an

9

injunction "prohibiting further unlawful violence or threats of violence." (§ 527.8, subd. (j).) It defines "[c]redible threat of violence" as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.8, subd. (b)(2).) It then defines " '[c]ourse of conduct' " as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose . . . ." (§ 527.8, subd. (b)(1).) "If the judge finds by clear and convincing evidence that the respondent engaged in unlawful violence or made a credible threat of violence, an injunction shall issue prohibiting further unlawful violence or threats of violence." (§ 527.8, subd. (j).)

In *Scripps,* the court observed that "at first glance the express language of section 527.8, subdivision (f) appears to provide that once the trial court finds by clear and convincing evidence a defendant has engaged in an act of unlawful violence a permanent injunction shall issue prohibiting further unlawful violence. However, a closer look at the subdivision within the context of the entire statute, its underlying legislative intent and the nature of injunctive relief, persuades us such a literal interpretation cannot be given to the disputed statutory language." (*Scripps, supra,* 72 Cal.App.4th at p. 332.)

The court noted that "injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed. [Citation.]" (*Scripps,* 72 Cal.App.4th at p. 332.) It added: "Our review of the underlying legislative history and documents relevant to the enactment of section 527.8 has disclosed no evidence of a legislative intent to alter the traditional nature of prohibitory injunctive relief in this setting." (*Id.,* at p. 335.) It therefore held that: "[T]o obtain a permanent injunction under section 527.8, subdivision (f), a plaintiff must establish by clear and convincing evidence not only that a defendant engaged in unlawful violence or made credible threats of violence, but also that great or irreparable harm would result . . . if a prohibitory injunction were not issued due to the reasonable probability unlawful violence will occur in the future." (*Ibid.,* fn. omitted.) The court also indicated (in dictum) that the same standard would apply under section 527.6. (*Scripps, supra,* 72 Cal.App.4th at p. 333.)

10

Accordingly, we disagree with *both* parties. Robles is not automatically entitled to a renewed civil harassment restraining order. Although past harassment may be taken as a given, a plaintiff seeking a renewal injunction still must establish a reasonable probability that, if the injunction is *not* renewed, the defendant will *resume* his or her harassing course of conduct.

At the same time, Robles is not required to show any further harassment since the original injunction was issued-much less any *recent* further harassment. "Injunctive relief can be denied where the defendant voluntarily discontinues the wrongful conduct. [Citation.]" (*Cisneros v. U.D. Registry, Inc.* (1995) 39 Cal.App.4th 548, 574.) However, it does not *have* to be denied unless the trial court finds that the discontinuance is both voluntary and in good faith. (*Phipps v. Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110, 1118.)

Here, the trial court could find it was reasonably probable that, absent a renewed injunction, McErlain would engage in renewed harassment. Section 527.6 requires "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose," which is "directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (§ 527.6, subd. (b)(1) & (3).) Thus, in the original injunction proceeding, the trial court necessarily found not only that McErlain had engaged in harassment, but also that his harassing conduct evidenced a continuity of purpose.

After the original injunction was granted, McErlain displayed continued antagonism toward Robles. He videotaped Robles and posted derogatory statements about her on the front door of his rental unit, which is adjacent to Robles's unit. He had a neighbor contact Robles and give her a picture of him, as he stood nearby watching in the hallway. He also made rude and threatening gestures towards Robles on numerous occasions. McErlain also would sit in his car in the parking garage and would flash his lights and honk his horn at Robles and other neighbors.

McErlain maintains that the incidents subsided after he was properly medicated. However, the record reflects at least two of the incidents occurred after McErlain was on

11

medication.  More than two years after the original restraining order was issued, McErlain was engaging in confrontational behavior toward Robles.  Based on these facts, the trial court could reasonably find that McErlain continued to harass and vex Robles.

We conclude that the trial court's issuance of the renewed civil harassment restraining order was supported by substantial evidence.

## D.    *Evidentiary Issues*

McErlain next contends that the trial court committed several evidentiary errors, which require the reversal of the renewed civil harassment restraining order.  According to McErlain, the court erred in admitting evidence of the pending criminal charges against him, excluding the declarations of several character witnesses, and excluding evidence pertaining to his favorable changed circumstances.  He also claims the trial court erred in failing to issue rulings on his evidentiary objections lodged against Robles's renewal petition.

" ' "Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion." ' [Citation.]  The court's ' "discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered." ' [Citation.]  However, even where a trial court improperly excludes [or admits] evidence, the error does not require reversal of the judgment unless such error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)  [The appellant] has the burden to demonstrate it is reasonably probable a more favorable result would have been reached absent the error. [Citation.]" (*Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 142.)

### 1.    *Pending Criminal Charges*

McErlain claims that the trial court erred in admitting evidence pertaining to the pending/unadjudicated criminal charges against him.  McErlain, however, did not object to the challenged evidence below.  In fact, the record reflects that it was McErlain's own attorney who sought to introduce evidence pertaining to the pending charges.  Defense counsel, who incidentally also represents McErlain on appeal, wanted to question the attorney representing McErlain in the criminal matters so that he could "describe what

12

[McErlain] is being accused of in those criminal matters." Specifically, defense counsel sought to introduce evidence that the pending criminal charges, stemming from violations of the various restraining orders against McErlain did not involve "any . . .violence."

The trial court ruled that the criminal matters were "not relevant" to the instant proceedings. Nevertheless, defense counsel was able to elicit from the criminal defense attorney that he was representing McErlain in "criminal matters," all of which were "currently pending." On cross-examination, the criminal defense attorney testified that ten criminal charges were pending against McErlain.

On appeal, McErlain now claims the challenged evidence was irrelevant and, thus, inadmissible. This argument not only fails because it was not raised below, but also because any possible error in considering this evidence was clearly invited by McErlain himself. (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2014) 202 Cal.App.4th 35, 41 [failure to raise evidentiary error below forfeits issue on appeal]; *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000 [appellant cannot complain of error personally invited].) Nevertheless, even considering the merits of this claim, it necessarily fails.

Assuming arguendo that the limited evidence regarding the existence of the pending criminal charges against McErlain was irrelevant, he has not argued, or carried his burden on appeal to show that it is reasonably probable a more favorable result would have been reached absent the purported error. (*Poniktera v. Seiler, supra,* 181 Cal.App.4th at p. 142.)

2.    *Supporting Declarations and Changed Circumstances*

McErlain argues that the court erred in excluding "several declarations from witnesses who know him and attested to his improved behavior during the prior year." He claims the challenged evidence, some of which pertained to his "medical diagnosis and recent treatment" was relevant in determining the "likelihood of any future bad conduct" on his part.

Evidence Code section 210 states: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having

13

any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." (*People v. Garceau* (1993) 6 Cal.4th 140, 177, disapproved on another point in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.) "Evidence is relevant when no matter how weak it is it tends to prove a disputed issue." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.) " '[T]he trial court is vested with wide discretion in determining relevance.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 512.)

Applying those rules here, we conclude that the trial court was well within its discretion to exclude the numerous declarations from friends and/or family, which describe McErlain's new and improved behavior. This evidence was cumulative. More importantly, the manner in which McErlain acted around other people simply was not relevant to how he conducted himself around Robles.

To the extent it can be argued that the trial court erred in excluding the declaration from McErlain's treating psychiatrist, as well as one from the neuropsychiatrist hired by McErlain's criminal defense attorney, any such error did not result in a miscarriage of justice. McErlain sought to introduce this evidence to establish that his behavior had changed since April 2012, when he began to positively respond to medication taken for his bipolar disorder. However, the record reflects that McErlain engaged in harassing behavior as late as June 2012. In other words, McErlain has not carried his burden on appeal to show that the purported error was prejudicial. (*Poniktera v. Seiler, supra,* 181 Cal.App.4th at p. 142.)

*3. Ruling on Objections*

McErlain also claims that the trial court erred in failing to issue rulings on his evidentiary objections lodged against Robles's renewal petition. For each of these objections McErlain challenged the relevancy of Robles's statements, as well as her veracity. However, at no time during the hearing did McErlain seek to secure a ruling on his evidentiary objections.

The standard for appellate review of evidentiary objections made but not resolved in the trial court is somewhat problematic. As a general rule, "a party objecting to the admission of evidence must press for an actual ruling or the point is not preserved for appeal. [Citations.]" (*People v. Hayes* (1990) 52 Cal.3d 577, 619; but see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 517, 532-533 [where written evidentiary objections are properly filed before summary judgment hearing, they are not waived by trial court's failure to rule].) *Reid v. Google, Inc., supra,* 50 Cal.4th 512 resolved certain aspects: written evidentiary objections made prior to the hearing on a summary judgment motion are deemed made at the hearing on the motion (*id.* at pp. 526, 531-532, § 437c, subd. (b)(5); see *id.* subd. (d)); and rulings not made in the trial court are deemed overruled in the trial court's consideration of the motions and are preserved for appeal. (*Reid v. Google, Inc., supra,* 50 Cal.4th at pp. 532-535; *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 890.) A corollary to this latter rule is that the appellate court assumes that the trial court considered the evidence notwithstanding the objectionable (but not excluded) evidence in ruling on the merits of the motion made under section 437c. (See *Reid v. Google, Inc., supra,* 50 Cal.4th at p. 526.)

The instant case, however, does not involve a summary judgment motion. In any event, we reach the merits of McErlain's evidentiary claim and conclude it fails. First, the trial court accepted Robles's offer of proof that she would testify in conformance with the facts raised in the renewal petition and in her trial brief. This determination necessarily represents the court's implied evidentiary ruling that the facts alleged in Robles's petition were relevant and that there was adequate foundation upon which Robles made her assertions. Second, McErlain's counsel agreed to the offer of proof and proceeded to cross-examine Robles in an effort to undermine the veracity of her statements. After hearing the evidence, the trial court found in favor of Robles.

As explained *ante,* on appeal, we resolve all conflicts in the evidence in favor of the prevailing party, and defer to the trial judge on issues of fact and credibility. (*Schild, supra,* 232 Cal.App.3d at p. 762.) Applying this rule, we conclude the trial court acted

15

well within its discretion in impliedly ruling that statements raised in Robles's renewal petition were relevant and credible.

## E.    *Attorney Fees*

Finally, McErlain contends that the trial court erred in awarding attorney fees to Robles because he opposed the renewal motion in "good faith" and also because Robles failed to provide the "requisite" information to the court for determining the reasonableness of the fees. These contentions are without merit. However, as we shall explain, there is merit to McErlain's argument that the trial court erred in applying an enhancement to the fees awarded.

### 1.    *Authority to Award Fees*

In actions for injunctive relief against harassment, the prevailing party "may be awarded court costs and attorney's fees . . . ." (§ 527.6, subd. (r); *Krug v. Maschmeier* (2009) 172 Cal.App.4th 796, 800-802, & fn. 5 (*Krug*).) The decision whether to award attorney fees to a prevailing party is a matter committed to the discretion of the trial court. (*Krug, supra,* 172 Cal.App.4th at p. 802.) We find no abuse of discretion here.

McErlain suggests that his good faith opposition to Robles's renewal petition justified a denial of fees in this case. He cites no authority for this novel proposition, which is, in fact, contrary to case law. A different panel of this division explained in *Krug, supra,* 172 Cal.App.4th at page 803, that section 527.6, unlike other statutes, does not make an award of attorney fees contingent upon the conduct of the parties. Accordingly, *Krug* held that a prevailing defendant may be awarded attorney fees irrespective of whether the plaintiff had brought the action in good faith. (*Id.* at pp. 802-803.) So, too here, McErlain's alleged good faith in opposing the action presents no bar to Robles's recovery of attorney fees.

Alternately, McErlain argues that Robles was not entitled to fees because she did not recover all of the relief she requested. This contention is without merit. Robles requested and was granted a renewal of the restraining order. She was the prevailing party. That the order granting the renewal modified some of Robles's requests does

16

nothing to alter this conclusion.  In sum, the trial court did not abuse its discretion in awarding attorney fees to Robles as the prevailing party.

>    2.    *Documentation Required*

Citing *Martino v. Denevi* (1986) 182 Cal.App.3d 553 (*Martino*) and *Best v. California Apprenticeship Council* (1987) 193 Cal.App.3d 1448 (*Best*), McErlain contends an attorney fees award cannot be based solely on declarations of counsel as to the total fees incurred, but must be supported by itemized time sheets or billing records and by declarations detailing the experience and expertise of the attorney and attesting to the reasonableness of the fees charged.  Not so.

It is well established detailed billing records are *not* required to affirm an attorney fees award.  "In California, an attorney need not submit contemporaneous time records in order to recover attorney fees. . . . Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records.  [Citations.]" (*Martino, supra,* 182 Cal.App.3d at p. 559; see also *Steiny & Co. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 293.)

The cases McErlain cites do not aid him.  In *Martino, supra,* 182 Cal.App.3d 553, the court reversed an attorney fees award where "[t]he only evidence presented in support of the motion for attorney fees was the attorney's request for a flat fee for 'services rendered.'  No documents, such as billing or time records, were submitted to the court, nor was an attempt made to explain, in more than general terms, the extent of services rendered to the client." (*Id.* at pp. 559-560.)  Rather, the attorney testified that he determined the fee to be paid based on a "general 'feeling' " about the case.  (*Id.* at p. 560.)  This, the court determined, was not sufficient " ' evidence' " to support an award of $40,000 in attorney fees.  (*Id.* at p. 560.)

Here, unlike in *Martino* the attorney fees request was adequately supported by a declaration signed under penalty of perjury by Robles's attorney, which set forth the billing rate and the number of hours worked in preparing the renewal petition.  It was not the kind of bare "request for a flat fee" rejected by the appellate court in *Martino.*

17

Equally misplaced is McErlain's citation to *Best, supra,* 193 Cal.App.3d 1448. That case, which actually affirmed an award of attorney fees, stands for the general proposition that to have an adequate basis for determining a reasonable fee, a court must have a relevant and appropriate compilation of hours. (*Id.* at pp. 1470-1472.) Nothing in *Best* suggests that the documentation in this case was so inadequate or deficient, that the court could not award fees without abusing its discretion.

Accordingly, we conclude the trial court did not abuse its discretion in awarding attorney fees to Robles.

3. *Enhancement*

McErlain also argues that the trial court improperly added a 20 percent enhancement. Originally, Robles's counsel had requested a 40 percent "bump" because he had brought a recent case to the court's attention, which purportedly set forth the appropriate standard for renewing civil harassment orders.[2] Counsel also argued that the "extraordinary circumstances" of the instant case, together with the numerous pending criminal cases also justified an enhancement. The trial court granted the enhancement, ruling: "Well, it's an unusual situation. I agree that 40 percent is probably reasonable, but the Court will grant 20 percent." This was error.

As explained in *Ketchum v. Moses* (2001) 24 Cal.4th 1122. (*Ketchum*) citing *Serrano v. Priest* (1986) 20 Cal.3d 25, 48 (*Serrano III*): "[A] court assessing attorney fees begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.' [Citation.] [The California Supreme Court] expressly approved the use of prevailing hourly rates as a basis for the lodestar . . . ." (*Ketchum, supra,* 24 Cal.4th at pp. 1131-1132.)

"[T]he lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting

---

[2] As discussed *ante*, the cases cited by Robles's counsel pertain to restraining orders under the DVPA, not civil harassment restraining orders under section 527.6.

them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award.  (*Serrano III, supra,* 20 Cal.3d at p. 49.)  The purpose of such adjustment is to fix a fee at the fair market value for the particular action.  In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.  The ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' (*Ibid.*)"  (*Ketchum, supra,* 24 Cal.4th at p. 1132.)

The lodestar adjustment method, which includes a multiplier applied to enhance the lodestar amount, is not applicable to cases, such as this one, which do not involve a fee-shifting statute, contingent risk to the attorney, or the enforcement of an important public right or policy.  (*Serrano III, supra,* 20 Cal.3d at p. 49; *Ketchum, supra,* 24 Cal.4th at p. 1132.)

On this record we conclude that enhancement of the fees was inappropriate because counsel's lodestar figure already factored in results obtained, any novelty and difficulty of the case and the quality of the litigation.  (*Ketchum, supra,* 24 Cal.4th at p. 1132.)  This was not a particularly difficult or extraordinary case warranting an enhancement.  Moreover, counsel did not face the risk of a contingency fee agreement, as the record reflects that this matter was billed on an hourly basis.

We conclude the trial court abused its discretion in awarding a fee enhancement.  Accordingly, we reverse for a redetermination of the amount of attorney fees Robles is entitled to receive as the prevailing party.

### III. DISPOSITION

We reverse the order granting attorney fees and remand for redetermination of the amount of fees based on a straight lodestar calculation, without any enhancements.  In all other respects, the judgment is affirmed.  Each party to bear their own costs on appeal.

_____
REARDON. J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.