Filed 10/12/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JULIE PARK et al., | B323063 |
| Plaintiffs, Cross-defendants and Respondents, | (Los Angeles County Super. Ct. No. 21STCV42599) |
| v. | |
| NMSI, INC., | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Affirmed.

Lee, Hong, Degerman, Kang & Waimey, Eric D. Olson and Soojin Youn for Defendant, Cross-complainant and Appellant.

Kingfisher Law, Nithin Kumar; Cohen Williams, Marc S. Williams, Alyssa D. Bell and Martin J. Christopher Santos for Plaintiffs, Cross-defendants and Respondents.

_____

At the request of plaintiffs and cross-defendants Julie Park and Danny Chung, the trial court issued prejudgment right to attach orders (RTAO) in the aggregate amount of $7,192,607.16 against their former employer, NMSI, Inc.  Appealing the orders as authorized by Code of Civil Procedure section 904.1, subdivision (a)(5),[1] NMSI contends Park and Chung failed to establish the probable validity of their claims because, contrary to the allegations in their first amended complaint, the agreements underlying their breach of contract causes of action had been modified through an exchange of emails, as well as by the parties' subsequent conduct.  NMSI also contends the amounts to be attached were not readily ascertainable and the court erred in considering documents incorporated by reference into the applications for a writ of attachment.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Park's and Chung's Revenue-sharing Agreements*

NMSI is a residential mortgage lender licensed in 26 states with six regional fulfillment centers in this country and a foreign branch in Korea.  NMSI funded loans exceeding $5.5 billion in 2020 and $5.6 billion in 2021.[2]

---

[1]     Statutory references are to this code unless otherwise stated.

[2]     "A real property loan generally involves two documents, a promissory note and a security instrument.  The security instrument secures the promissory note.  This instrument 'entitles the lender to reach some asset of the debtor if the note is not paid.  In California, the security instrument is most commonly a deed of trust (with the debtor and creditor known as trustor and beneficiary and a neutral third party known as trustee).  The security instrument may also be a mortgage (with mortgagor and mortgagee, as participants).  In either case, the

Park and Chung were both employed in NMSI's Brea office. Chung was the company's chief marketing officer; Park was the executive vice president. In January 2019 Chung and Park entered into almost identical, but separate, branch manager/sales manager employment agreements with NMSI (2019 agreements). Pursuant to their 2019 agreements, Park and Chung were both responsible for the operation of the branch, including hiring and paying operating expenses. In consideration Park and Chung were jointly entitled to 75 percent of the net revenue generated by loans originated by their branch office provided the net revenue of the office was greater than $90,000. Under the terms of the 2019 agreements, revenue included loan origination fees, discount points, rebates, processing fees, any other fees charged to the borrower at the time of closing, branch margin built-in on top of NMSI's wholesale rate sheet, net premiums gained through the sale of branch loans in the secondary market and any net revenue gained on the lender's fee. Expenses included rent, utilities, taxes and payroll.

The 2019 agreements were fully integrated and provided they could be modified only by the written agreement of the parties. Section 24.5 of each agreement stated, "This agreement constitutes the entire understanding between the parties hereto . . . and shall not be terminated . . . or amended, except in a writing executed by the parties hereto." Section 24.13 reiterated that "[t]his agreement may be modified only by a further writing that is duly executed by both parties."

---

creditor is said to have a lien on the property given as security, which is also referred to as collateral.'" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1235.)

2. *The October 2019 Proposed Modification*

In September 2019 Jae Chong, NMSI's chief executive officer, first proposed a change to the compensation structure in the 2019 agreements. According to Chong, Chung orally agreed to the terms of the modifications, which were then confirmed in an email Chong sent Chung on October 22, 2019. The subject line of the email (in Korean) stated, "[R]e: what we discussed yesterday." The body of the email purported to summarize the terms of the modified agreement and, in particular, that the share of branch net revenue paid to Chung and Park would be reduced from 75 percent to a range between 25 percent and 40 percent based on what was described as a sliding scale proportionate revenue sharing model. On October 23, 2019 Chung emailed (also in Korean) stating, "All agreed. What you said about the profit sharing starting in January next year means that the loan purchase date in the P&L [profit and loss] will be January, right?"

Beginning in January 2020 NMSI paid Park and Chung according to the October 2019 sliding scale model. Chung promptly notified NMSI's accounting department that neither he nor Park had agreed to modify their compensation structure. Nevertheless, the reduced compensation continued; and, as Park and Chung have alleged in this lawsuit, in August 2020 NMSI reduced their compensation even further by refusing to share revenues generated by loan servicing and the sales of servicing rights.

On January 14, 2021 Park and Chung were advised that NMSI was terminating their employment. Thereafter, NMSI allegedly began withholding commissions owed to two other NMSI loan originators (Mike Koh and Ryan Kim) "for no

4

apparent reason other than their long-time association" with Park and Chung.

### 3. *The Operative First Amended Complaint*

Park, Chung, Koh and Kim sued NMSI and Chong on November 18, 2021 and filed a verified amended complaint on January 7, 2022 alleging causes of action for breach of contract, failure to pay wages, breach of fiduciary duty, accounting and violation of California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.). As to Park and Chung, the amended complaint alleged, "[I]f the proper 75% split had been applied to the net revenue amounts calculated by NMSI for 2020 and 2021, [they] would have received over $9 million additional dollars. . . . Of that amount, $7.5 million should have been paid . . . in 2020, and $1.8 million should have been paid in 2021." The amended complaint attached as exhibits the 2019 agreements.

### 4. *The Right To Attach Order and Writs of Attachment*

On February 2, 2022 Park filed an ex parte application for writ of attachment. Park's application included a declaration describing NMSI's breach of the 2019 revenue sharing agreements and asserted that she and Chung were owed past compensation totaling $9,624,329.39. The declaration detailed Park's calculation of the amount due and was supported by what purported to be NMSI's profit and loss statements for 2019, 2020 and the first half of 2021. The trial court, finding no exigency, denied the ex parte application without prejudice to filing a regularly noticed motion.[3]

---

[3] Shortly after the trial court denied the ex parte application for a writ of attachment, NMSI filed a cross-complaint against Park and Chung for breach of fiduciary duty, aiding and abetting

5

On May 27, 2022 Park and Chung filed new applications for an RTAO, seeking to attach $9,624,329.39 (divided equally between Park and Chung) on the ground they had established the probable validity of their breach of contract claims.  They argued, "NMSI breached Plaintiffs' branch manager agreements by failing to apply the proper compensation formula to the net revenues generated in 2020 and 2021, as well as by failing to pay any share of other revenues that were excluded from the profit[ ] and loss statements."

The application was supported by declarations from Park and Chung.  In his declaration Chung denied he had been acting on behalf of Park when discussing the proposed October 2019 modification, and insisted it was his understanding that "NMSI would be sending written agreements containing the exact details of the proposed modification, at which point Ms. Park and I would be able to negotiate further before signing the agreements. I never intended to waive the requirement in my branch manager agreement that any modifications to the agreed-upon terms be made only pursuant to an executed written agreement, nor did I ever sign anything in the writing modifying my branch manager agreement."  Park's declaration similarly denied modification and asserted she had "repeatedly informed Jae Chong that Mr. Chung was not authorized to negotiate on my behalf."  Park also reaffirmed her February 2, 2022 declaration, submitted with the ex parte application, which "remains true and accurate and is incorporated by reference as if set forth herein."

NMSI opposed the motion, arguing Park and Chung "have not and cannot establish the 'probable validity' of their claims or

breach of fiduciary duty, breach of contract and unfair competition.

that their damages are in a 'readily ascertainable' amount because the very formula for calculating those purported damages is the central issue in dispute in this case. Moreover, Plaintiffs claim for themselves a purported right to attach over $9.6 million as purported damages that differs from the amount of damages claimed in the verified complaint, and which were calculated by combining the claims of all plaintiffs," including Koh and Kim who were not parties to the motion for writ of attachment. Finally, Chong contended in his declaration that his email exchange with Chung confirmed they had agreed to the modified revenue sharing, a modification that was also confirmed by Park's and Chung's subsequent conduct. Chong also asserted "it was common practice for Chung to communicate . . . on both his and Park's behalf."

The trial court on July 26, 2022 found Park and Chung had established the probable validity of their breach of contract claims and issued right to attach orders and authorized writs of attachment on behalf of Park and Chung for $3,596,303.58 each (a combined total of $7,192,607.16). The court concluded (using the probable validity standard) the 2019 agreements had not been modified as argued by NSMI, finding that Chung "did not insert an electronic signature or other symbol showing intent to sign a modified agreement by his email" and, in addition, Chung did not have authority to enter into any modification agreement on behalf of Park. The court also found the 2019 agreements had not been modified by the subsequent conduct of Park and Chung.

In setting the amount to be attached, the court, after concluding there was sufficient evidence NMSI had breached the 2019 revenue sharing agreement, found that Chung and Park had submitted "undisputed evidence that they jointly suffered

7

damage of $6,681,150.82." The court noted that NMSI did "not provide any responsive declarations about damages or argue that Park's calculations of damages under the profit-sharing plan from the January 2019 agreement are inaccurate." The court also found that NMSI had failed to rebut Park and Chung's claim an additional $163,688.94 was due for selling mortgage servicing rights and $347,767.33 for outstanding branch reserves that were to be paid within 30 days of termination of the 2019 agreements. However, the court agreed a material disputed issue existed whether Park and Chung were entitled to compensation for servicing one type of loan product ("KVOE loans") (75 percent of $3,242,296.32) and, on that basis, concluded they had failed to show a probable validity of prevailing on that aspect of their damage claim.[4]

## DISCUSSION

1. *Governing Law and Standard of Review*

"Attachment is an ancillary or provisional remedy to aid the collection of a money demand by seizure of property in advance of trial or judgment as security for satisfaction of a judgment for the attaching party." (*Burke v. Superior Court* (1969) 71 Cal.2d 276, 279, fn. 3; accord, *Rreef America Reit II Corp, YYYY v. Samsara Inc.* (2023) 91 Cal.App.5th 609, 616-617 (*Rreef America*); *Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1476.) With exceptions not applicable here, "an attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim

---

[4] Park and Chung each posted an undertaking of $10,000, as ordered.

8

or claims is a fixed or readily ascertainable amount." (§ 483.010.) The amount to be secured is "[t]he amount of the defendant's indebtedness claimed by the plaintiff" plus an estimated amount for attorney fees and costs authorized by the court. (§§ 483.015, subd. (a)(1), (2), 482.110; see *Royals v. Lu* (2022) 81 Cal.App.5th 328, 345.)

"Before an attachment order is issued, the court must find all of the following: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the applicant has established 'the probable validity' of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery upon which the request for attachment is based; and (4) the amount to be secured by the attachment is greater than zero. [Citation.] The plaintiff has the burden of establishing the probable validity of the claim upon which the attachment is based." (*Rreef America, supra,* 91 Cal.App.5th at p. 617; accord, *Royals v. Lu, supra,* 81 Cal.App.5th at p. 345; *Goldstein v. Barak Construction* (2008) 164 Cal.App.4th 845, 852.) Probable validity means "it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." (§ 481.190.)

"'On appeal from an attachment order, we review the record for substantial evidence to support the trial court's factual findings.' [Citation.] 'We will not disturb a determination upon controverted facts unless no substantial evidence supports the court's determination.' [Citation.] However, where there are no contested issues of fact, the issue becomes one of law subject to de novo review." (*Rreef America, supra,* 91 Cal.App.5th at p. 617; accord, *Goldstein v. Barak Construction, supra,* 164 Cal.App.4th at p. 853; see *Santa Clara Waste Water Co. v. Allied World*

*National Assurance Co.* (2017) 18 Cal.App.5th 881, 885 ["[a] trial court's finding on whether a plaintiff established probable validity is reviewed for substantial evidence"].)  To the extent issuance of an RTAO raises questions of statutory interpretation, our review is de novo.  (See *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [questions of statutory interpretation are pure matters of law that we review de novo].)

　　2.　*Substantial Evidence Supports the Trial Court's Finding of the Probable Validity of Park's and Chung's Contract Claims*

　　　　a.　*The finding the 2019 agreements were not modified by the October 2019 email exchange*

NMSI contends the trial court misinterpreted the law regarding electronic signatures when finding the email exchange between Chong and Chung did not effect a modification of the 2019 agreements.  According to NMSI, Chung's email of October 23, 2019, which included "his full name, title, address, two phone numbers, email address, and webpage URL," was all that was needed to satisfy the electronic signature requirement of the Uniform Electronic Transactions Act (UETA) (Civ. Code, § 1633.1 et seq.).

Under the UETA an electronic signature has the same legal effect as a handwritten signature.  (Civ. Code, § 1633.7, subd. (a) ["[a] signature may not be denied legal effect or enforceability solely because it is in electronic form"]; *Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 843; see *Ni v. Slocum* (2011) 196 Cal.App.4th 1636, 1647 ["the Legislature has, through these provisions, expressed general approval of the use of electronic signatures in commercial and governmental transactions"].)  But to be effective, an electronic signature must be "executed or adopted by a person with the intent to sign the

10

electronic record." (Civ. Code, § 1633.2, subd. (h).) Thus, although Chung's name was at the bottom of his October 23, 2019 email, more was required to establish he electronically signed the email with the intent to modify his (let alone Park's) revenue sharing agreement. (See *J.B.B. Investment Partners*, *Ltd. v. Fair* (2014) 232 Cal.App.4th 974, 988-989 (*J.B.B. I*) ["[a]ttributing the name on an e-mail to a particular person and determining that the printed name is '[t]he act of [this] person' is a necessary prerequisite but is insufficient, by itself, to establish that it is an 'electronic signature'"].)

NMSI's contention the UETA does not require evidence of an intent to sign unless the authenticity of an electronic signature has been called into question—and that the trial court, therefore, erred in finding no modification of the 2019 agreement had occurred—finds support in neither statutory language nor pertinent case law.

The UETA only applies "to a transaction between parties each of which has agreed to conduct the transaction by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." (Civ. Code, § 1633.5, subd. (b); see *J.B.B. I*, *supra*, 232 Cal.App.4th at p. 988 ["UETA applies, however, only when the parties consent to conduct the transaction by electronic means"].) Based on the evidence it received regarding the October 2019 emails, the trial court found that "Chung did not insert an electronic signature or other symbol showing intent to sign a modified agreement by his email" because "[t]he body of the emails . . . appears to document a 'discussion' or 'thoughts' about a revised compensation structure. . . . In the October 23 email, Chung asked a follow-up

question to Chong, which suggests that the parties were still discussing potential terms of a modification, not that they were executing a final modified agreement." We necessarily defer to the trial court's credibility finding that Chung did not have an "intent to sign the electronic record" under Civil Code sections 1633.2, subdivision (h), and 1633.5, subdivision (b). (See *Nunez v. Cycad Management LLC* (2022) 77 Cal.App.5th 276, 283-284 ["[w]hen the court weighs conflicting declarations, we defer to its factual determinations; we have no authority to make new credibility findings"]; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3 ["that the trial court's findings were based on declarations and other written evidence does not lessen the deference due those findings"].)

The trial court's finding (and with it, the court's implicit interpretation of the requirements of the UETA) is fully consistent with the decision in *J.B.B. I*, *supra*, 232 Cal.App.4th 974, in which the court concluded the defendant Fair's typed name in a July 2013 email did not satisfy the "strict signature requirements" of Code of Civil Procedure section 664.6, which governs stipulated settlements. (*J.B.B. I*, at pp. 990-993.) In finding that Fair's printed name at the bottom of the email was not a valid electronic signature under the UETA, the court explained, "Focusing only on [Civil Code] section 1633.7, the court appears to have simplistically assumed, as did counsel for plaintiffs, that because Fair admitted at deposition that the signature was his, and the signature was indisputably electronic, the printed signature on the July 4 offer was therefore an 'electronic signature' within the meaning of UETA. [¶] . . . [¶] The exchange of e-mail messages shows that the parties clearly agreed to negotiate the terms of the settlement by e-mail, but

12

plaintiffs did not demonstrate, as they must [citation], that the parties ever agreed to conduct transactions by electronic means or that Fair intended with his printed name at the end of his e-mail to sign electronically the July 4 offer." (*Id.* at pp. 988-989.)

Contrary to NMSI's argument, the discussion in *J.B.B. I* of the requirements for a valid electronic signature was not "clarified and limited" by the later opinion in the same case, *J.B.B. Investment Partners Ltd. v. Fair* (2019) 37 Cal.App.5th 1 (*J.B.B. II*). The court of appeal in its 2019 opinion simply explained that J.B.B. Investment had incorrectly attempted to extend its 2014 holding that Fair's typed name did not create a binding settlement agreement pursuant to Code of Civil Procedure section 664.6 to argue the plaintiffs' settlement offer had never been accepted and could not be enforced through some other procedural mechanism. (See *J.B.B. II*, at p. 13 ["Defendants' partial quotation from our 2014 opinion is misleading. We were not addressing whether Fair's responses to the July 4 offer created a binding settlement agreement, but instead were addressing the fact that '[t]he plain language of the July 4 offer made it clear that no signature was being requested as the offer included no signature line or signature block, contained no signature by any of the plaintiffs, and advised that future paperwork was forthcoming,'" italics omitted].) *J.B.B. I*'s explanation of the requirements for a valid electronic signature under the UETA remains persuasive authority, which we follow.

      b. *The finding the agreements were not modified by the parties' subsequent conduct*

There similarly is no merit to NMSI's argument challenging the trial court's probable validity finding directed to NMSI's contention the 2019 agreements were modified by the

subsequent conduct of Park and Chung.  Relying on *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1038, and the "uncontroversial principle that written contracts can be modified by conduct," NMSI emphasizes that Park and Chung both continued their employment after the modification and insists that on November 3, 2020 both "confirmed" in an email the profit and loss calculations for the month of October 2020.  NMSI also points to a June 14, 2021 email from Chung (after he left his employment with NMSI) in which he referred to the 40 percent revenue sharing modification.

A written contract that expressly precludes oral modification may nonetheless "be modified by an oral agreement to the extent that the oral agreement is executed by the parties." (Civ. Code, § 1698, subd. (b); see *LGCY Power, LLC v. Superior Court* (2022) 75 Cal.App.5th 844, 868 ["where, as here, a written agreement prohibits oral modifications, an oral modification nevertheless is enforceable to the extent it has been executed by the parties"].)  Moreover, even if not modified by an executed oral agreement, "the parties may, by their words or conduct, waive contractual rights." (*Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 78; see *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 ["'the parties may, by their conduct, waive [a no oral modification] provision' where evidence shows that was their intent"].)  "'[T]he pivotal issue in a claim of waiver [of contractual rights] is the intention of the party who allegedly relinquished the known legal right.'" (*Wind Dancer Production Group*, at p. 78; accord, *Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 678 ["[t]hus, '[t]he *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished

14

the known legal right'"]; *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd*. (1994) 30 Cal.App.4th 54, 60.) Waiver is ordinarily a question of fact unless "there are no disputed facts and only one reasonable inference may be drawn." (*DuBeck v. California Physicians' Service* (2015) 234 Cal.App.4th 1254, 1265.)

Substantial evidence supports the trial court's finding that the November 3, 2020 email does not show that "both Chung and Park personally supervised the calculations of the Brea branch profit and loss figures . . . which reflected the modified profit-sharing model, which they then sent to and confirmed with NMSI's accounting team," and its further finding that the email did not confirm the modified revenue sharing agreement because it "failed to include the attachment with the cover email," so "it cannot be determined from the November 2020 email what Plaintiffs were confirming." Also, as the trial court explained, the "June 2021 email of Plaintiff Chung which refers to a '40:60 split' . . . post-dates Plaintiffs' departure from NMSI [and] Park was not copied on this email. Defendant does not show that the June 2021 email constitutes a signed, written modification by Chung or Park." (See generally *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1339 ["'"[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"'"]; *Goldstein v. Barak Construction, supra*, 164 Cal.App.4th at p. 853 ["[w]e will not disturb a determination upon controverted facts unless no substantial evidence supports the court's determination"].)

To the extent NMSI contends Park's and Chung's continued employment was sufficient conduct to modify the 2019 revenue sharing agreements, this argument has been forfeited because it

15

was not raised in the trial court.  NMSI argued in general only that "there are substantial questions of contract interpretation, estoppel, waiver, ratification, and other legal questions" and insisted "[t]hese issues are not resolvable in an Attachment proceeding."  The trial court appropriately declined to develop this argument for NMSI, and it is not properly considered by this court in the first instance.  (See *Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488 ["appellate court can deem an argument raised in an appeal . . . waived if it was not raised below and requires consideration of new factual questions"]; *City of Merced v. American Motorists Inc. Co.* (2005) 126 Cal.App.4th 1316, 1327 ["[s]ince this new theory involves an issue of fact . . . and the facts to support the theory were not developed below, we find the argument was waived for failure to raise it in the trial court"]; *Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712 ["[p]oints not urged in the trial court may not be urged for the first time on appeal"].)

### 3. *The Trial Court Did Not Err in Determining the Claims Were for a Fixed or Readily Ascertainable Amount*

As discussed, an attachment generally may be issued only in an action where the claim for money is for "a fixed or readily ascertainable amount."  (§ 483.010, subd. (a).)  ""The fact that the damages are unliquidated is not determinative.  [Citations.]  But the contract sued on must furnish a standard by which the amount due may be clearly ascertained and there must exist a basis upon which the damages can be determined by proof.""" (*CIT Group/Equipment Financing, Inc. v. Super DVD, Inc.*, (2004) 115 Cal.App.4th 537, 540; accord, *Force v. Hart* (1928) 205 Cal. 670, 673 ["[i]t is a well-recognized rule of law in this state that an attachment will lie upon a cause of action for

16

damages for a breach of contract where the damages are readily ascertainable by reference to the contract and the basis of the computation of damages appears to be reasonable and definite"].)

In its opposition to the application for a right to attach order, NMSI did not challenge the calculations concerning revenue and expenses presented by Park upon which she and Chung based their damage claims. The trial court found, "[g]iven the level of detail provided and the lack of any opposing calculations," that Park's calculations were "credible and persuasive evidence under the probable validity standard."

Although not directly challenging the accuracy of the revenue figures provided by Park, on appeal NMSI argues "highly disputed factual issues" exist and the trial court improperly "made judgments about what was, and what was not, included in the original profit-sharing agreement." Specifically, NMSI contends "the servicing-related profits from 'MSR' loan sales" were not included as revenue under the terms of the 2019 agreements.

Park's declaration explained "MSRs are the various rights associated with servicing a loan, including the right to collect borrower payments, issue monthly statements, manage escrow funds, cure defaults, foreclose, etc. [¶] When NMSI sold loans to investors other than Fannie Mae, the investors typically purchased the MSRs along with the loans. NMSI always included the total loan proceeds for those loan sales in calculating the Brea branch's monthly revenues, and never sought to exclude any portion of the proceeds because the MSRs were included in the sale." Chong disputed this, insisting in his declaration that "[s]ervicing fees-related issues are not part of the original

17

agreement . . . and they were never included in the P&L calculations used to calculate Plaintiffs' income."

Noting that the 2019 agreements broadly defined revenue, which included "[a]ny other fees charged to the borrower," "[n]et [p]remiums gained on lender's fee" and "[n]et [p]remiums gained by sale of branch loans to the secondary market," the trial court accepted Park and Chung's position that these servicing related proceeds were part of the agreed-upon compensation.  The court acted well within its discretion in finding Park's declaration, rather than Chong's, persuasive and including this item in the amount of the claim subject to attachment.  (Cf. *Ramos v. Homeward Residential, Inc.* (2014) 223 Cal.App.4th 1434, 1441 ["we defer to factual determinations made by the trial court when the evidence is in conflict, whether the evidence consists of oral testimony or declarations"]; *Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 130 ["we resolve all conflicts in favor of the judgment, even when (as here) the trial court's decision is based on evidence received by declaration rather than by oral testimony"].)

Finally, it is of no consequence that the amount sought in the application for the RTAO ($9,624,329.39) exceeded the amount sought in the amended complaint ($9,563,684).  The total amount subject to attachment ordered by the trial court ($7,192,607.16), in addition to being less than the amount sought in the amended complaint, was properly based on the court's evaluation of the record and "the probable outcome of the litigation." (*Loeb & Loeb v. Beverly Glen Music, Inc.* (1985) 166 Cal.App.3d 1110, 1120 ["the court must consider the relative merits of the positions of the respective parties and make a determination of the probable outcome of the litigation"]; see

§ 484.090, subd. (d) ["[t]he court's determinations shall be made upon the basis of the pleadings and other papers in the record"]; *Goldstein v. Barak Construction, supra,* 164 Cal.App.4th at p. 853 [same].)

    4. *The Trial Court Properly Considered the Documents Incorporated by Reference*

Park and Chung based the amounts to be subject to attachment on the detailed calculations and supporting schedules in Park's declaration filed with the February 2022 ex parte application, which they incorporated into their May 2022 noticed applications.[5] NMSI contends such incorporation by reference is prohibited by section 484.040, subdivision (c); the trial court erred in overruling its objection to the consideration of that information; and, as a consequence, the orders should be reversed. The law is not so restrictive.

To be sure, section 484.040 provides, "[T]he defendant shall be served with all of the following: [¶] . . . [¶] (c) a copy of the application and of any affidavit in support of the application." That language does not preclude incorporation by reference of documents previously served on the defendant, and inferring such a prohibition would be inconsistent with California Rules of

---

[5] As discussed, in her declaration Park stated, "The testimony in my prior declaration remains true and accurate and is incorporated by reference as if set forth herein." Chung in his declaration stated, "I have reviewed the Declaration of Julie Park filed on February 2, 2022, which contains true and accurate information to the best of my knowledge." Although Chung did not use the word "incorporated," his reliance on Park's prior declaration was sufficient to bring that information before the trial court in support of his application. (See *Larsen v. Johannes* (1970) 7 Cal.App.3d 491, 496.)

Court, rule 3.1110(d), which expressly permits reference in a noticed motion to previously filed papers provided they are identified by date of execution and title.  In addition, section 484.090, subdivision (d), authorizes the court at the hearing on the application for a writ of attachment, upon good cause, to "receive and consider" additional evidence.  As the court of appeal held in *Roth v. Plikaytis* (2017) 15 Cal.App.5th 283, 291, "Consistent with these rules, a litigant *may* incorporate previously filed documents and, where practicable, should file them with the motion.  But a litigant is not required to do so absent a rule precluding incorporation by reference.  [Fn. omitted.]"  The trial court did not err in overruling NMSI's objection and considering the material from the earlier Park declaration.

### DISPOSITION

The order is affirmed.  Park and Chung are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

MARTINEZ, J.